Robertson, J.
delivered the opinion of the court :
It is well settled that a negro, claimed and held as a slave, cannot litigate his right to freedom under a writ of habeas corpus. In this case, however, the petitioner *260 produces Ms papers showing, on their face, that he has been regularly emancipated, and registered as a free negro: and it appears upon the return and evidence, that those holding him in custody do not claim him as their slave, but that he is held by virtue of an execution levied for the purpose of subjecting him to a debt due from A. Hanna.
The matter in controversy is not whether the petitioner is a freeman or a slave: but whether, as an emancipated negro, he is liable for a debt of Hanna, his former owner — that is to say, whether, being free, he is subject to a lien, the enforcement of which may have the effect of reducing him again to the condition of slavery.
In Ruddle's ex'or v. Ben, 10 Leigh 467, it was held that a writ of habeas comfits is an appropriate remedy in such case.
This decision, however, was made by a court composed of three judges only, one of whom dissented; and so is not of binding authority. But I think that the decision of the majority, upcni this question, was right: and the reasons given by Judge Parker in support of- it, are so clear and forcible, that I cannot do better than refer to that portion of his opinion, expressing my entire concurrence in the views presented by him, upon this point.
It becomes necessary, therefore, to determine whether or not the petitioner has been so emancipated as to exempt him from liability for the debt, the execution for which has been levied upon him.
It has, in the argument here, been objected that the facts upon which the petitioner relies are not sufficiently proved, because the contract which Hanna (according to his impression) executed and delivered, the various letters referred to as having been received by him from Dismuth, and the original bill of sale to Marshall, have not been produced; nor has their ab *261 sence been satisfactorily accounted for, so as to render secondary evidence of their contents admissible.
There can be no doubt that if objection had been made before the judge of the Circuit court to the admission of this secondary evidence, it must have prevailed. But an opportunity would then have been afforded the petitioner to remove it, either by the production of the papers, or by accounting for their non-production, so as to render proof of their contents proper. By its being taken for the first time in this court, the petitioner is deprived of that opportunity. The objection must therefore be overruled, and the facts stated in the bill of exceptions regarded as sufficiently proved.
The petitioner does not seem to me to stand in a better position, in any respect, than he would occupy if Hanna, on being reimbursed the amount advanced by him to Dismuth, had himself executed the deed of emancipation. The act was in truth substantially his: and the indirect mode of effecting it which was adopted, coupled with the false considerations recited in the bill of sale to Marshall, and in Marshall’s deed of emancipation, are calculated to create doubts as to the fairness of the transaction. But I think that the inference of fraud which might be drawn from these circumstances is abundantly repelled by the other facts of the case. These facts show that there was no design on the part of Hanna to defraud any one; and that his sole purpose was to carry out honestly the contract between Dismuth and himself. He had neither obtained nor sought credit on the faith of his property in the petitioner; having given public notice, in the neighborhood, of the agreement under which he held him, as soon as it was made. Nor was his ability to discharge his debts in the slightest degree affected by all that he did in reference to the petitioner : for, before he caused him to be emancipated, *262 he had received back every dollar that he had advanced. Hanna’s creditors therefore have no right to complain that they have been in any manner defrauded. If they can subject the petitioner to their claims, it is only by virtue of a mere legal right arising out of the peculiar mode of emancipation which was adopted by Dismuth and Hanna. I speak of the emancipation as their joint act, for it should in fact be so regarded. Hanna indeed did less towards the liberation of the petitioner than Dismuth: for to effect it Dismuth contributed half of his value; while Hanna contributed nothing, save the trouble he took upon himself, and the risk he encountered of not being reimbursed the amount of his advance to Dismuth.
In examining the question as to the validity of the claim of the creditors of Hanna, I utterly repudiate the idea that I should, on the one hand, give a more liberal construction to the rights of the petitioner, in favor of liberty; or, on the other, that I should applj a stricter rule, because I may think that emancipation in this state ought not to be encouraged. I propose to adopt precisely the same rules of construction and decision that would apply to any other question of legal right, leaning neither to the one side nor the other.
It is objected, that the deed of emancipation has not been duly recorded, because Marshall was a citizen of Ohio, residing temporarily only in the county of Rockingham. •
The deed describes him as being of the county of Rockingham, and it is admitted to record in that county, upon his acknowledgment before the clerk. This affords, I think, sufficient evidence that for the time, and within the meaning of the law, Rocking-ham was “ his county.” If the objection be valid, no person can emancipate a slave in Virginia, unless he has a fixed and permanent residence within the state. *263 Such cannot be the proper construction of the law. The cases of Cales v. Miller, 8 Graft. 6, and Hassler’s lessee v. King, 9 Gratt. 115, would seem to remove all doubt on this question, if indeed any existed.
To determine whether the execution of such a contract as that between Bismuth and Hanna, by the emancipation of the slave pursuant to it, confers upon him a right to freedom superior to the claims of the creditors of the party executing the deed of emancipation, it is proper to examine into the nature of the contract, and ascertain whether it is valid and capable of being enforced.
Hanna supposed that it bound him “in conscience and morality” only.- but if the facts stated by him show that it was legally binding also, his opinion to the contrary cannot affect its validity.
There was a valuable consideration moving from Bismuth to sustain the contract. He gave up half the value of the slave in consideration of the promise to emancipate. If then it was not binding between Bismuth and Hanna, it must be upon some other ground of objection to it than the want of sufficient consideration. There has been no adjudication in Virginia settling the question as to the validity of such a contract: but similar contracts have been passed upon by the courts of some of the other states of the Union.
In Tennessee, it has been held that such contracts are valid; and that they will be enforced, not only upon the application of one of the contracting parties, but also on that of the slave himself, or of any person whatever who may choose to petition for and on behalf of the slave. Elias v. Smith, 6 Humph. R. 33; Lewis v. Simonton, 8 Humph. R. 185 — the latter of which cases even goes so far as to declare that a contract for emancipation made between a master and his slave is valid and enforceable.
In Louisiana, prior to the act of 1857 (which prohi *264 bits emancipation in that state), a slave could make a contract relating to his own emancipation, although incapable of making a contract of any other kind. But in a case in which a testator had directed that his slaves should be sold together with the plantations on which they were employed, and that the purchaser should keep them on and attached to said plantations for a certain number of years, and then emancipate them — the slaves having been sold pursuant to the will, and upon the conditions required by it — the purchaser, before the time for emancipation had arrived, was proceeding to sell the slaves to different persons, to be removed from the plantations on which they were; and it was held that the court could not, on the application of the slaves themselves, interfere to prevent it. A suit was then brought by the heir of the testator, as representing his estate, for the purpose of enforcing the terms of the contract; and it was held that the purchaser was bound to comply with it, and a decree rendered accordingly. In delivering the opinion of the court, Martin, J. said:
“Justice requires that the defendant should not be permitted to disregard the obligation she has solemnly contracted. But it is urged that the terms and conditions of the will which are now sought to be enforced, are null and void, as destructive of the absolute power which sound policy and the laws of the land require the master should exercise over his slaves.
“ So far as regards the slaves, the power of the master is indeed absolute. The slave cannot resist, or be heard if he complain of the abuse of this power: but in relation to other persons, nothing prevents the master from being compelled or coerced to comply with his engagements as vendee, which he contracted when he acquired his slave.” Poydras v. Mourain, 9 Louis. R. 492, 505.
In Maryland, in a case where it appeared that a *265 slave was sold for a term of years, with a power to the vendee to emancipate him at the end of the term, and that the vendor, before its expiration, sold him to another person, who got possession of him and held him in slavery, it was decided that the slave was entitled to recover his freedom, under a deed of emancipation, executed in his favor, by the first vendee, after the expiration of the term. Negro Cato v. Howard, 2 Harr. & John. R. 323.
In Kentuclcy (whose statutes in reference to the recordation of deeds of emancipation, and the prohibition of slaves from going at large and trading as freemen, are almost identical with our own), it has been decided that a contract such as the one now under consideration cannot be enforced at the suit of the slave; but that a specific performance of it will be decreed at the suit of the original owner, who contracted with his vendee for the future emancipation of the slave. Beall v. Joseph (a negro), Hardin’s R. 51; Thompson, v. Wilmot, 1 Bibb’s R. 422; Willis v. Bruce & Warfield, 8 B. Monr. R. 548; Gatliffe’s adm'r v. Rose, 8 B. Monr. R. 629.
I have referred to these cases as showing the view that has been taken of this question in states with institutions similar to our own. The decisions are of course to be regarded as authority here only so far as they may commend themselves by the reasons upon which they are founded. It is proper, therefore, that we should examine the question as an original one.
It is well settled that a contract between a master and his slave, for the future emancipation of the slave, cannot be enforced against the master, although it may have been fully performed on the part of the slave. Sawney v. Carter, 6 Rand. 173; Stevenson v. Singleton, 1 Leigh 72.
It seems to me too to be equally clear that a slave who has, under such a contract, paid his master the *266 stipulated pi'ice for his freedom, aud who has been actually emancipated in consequence thereof, is liable to be subjected to the payment of any debt of his master, existing at the time of his emancipation. This is so, because the emancipation in such case is vvithout any valid considei'ation — the price paid by the slave not constituting such consideration, inasmuch as not only the slave himself, but every thing made by or belonging to him, is in law the property of his master.
It is true, that the opinion of a majority of the court, in Ruddle's ex'or v. Ben, appears to be in conflict with this view: but, as has been already stated, that case is not binding as authority; and the decision in this l’espect (as indeed is shown by Judge Tucker, who dissented on this point) is so opposed to the necessary consequences resulting from the relation of master and slave, that it cannot be regarded as law.
I think further, that a slave cannot, while remaining ,in the condition of slavery, enforce a contract which may have been made by-other persons for his benefit. If, therefore, Hanna had refused to comply with his contract with Dismuth, the petitioner could not by any legal proceeding have compelled him to do so. But it does not follow that the contract could not have been enforced by Dismuth.
It will hardly be contended that Dismuth could not enfoi’ce a contract with Hanna, by which Hanna, having paid him a certain sum as the hire of his slave, bound himself that as soon as he received an equal amount from the proceeds of the labor of the slave, he should be returned to Dismuth, or delivered up to any person to whom Dismuth might order him to be delivered. And if such a contract as the one supposed would be valid and binding, it is difficult to perceive why a contract that the slave, instead of being returned to Dismuth, or delivered to his order, at the time agreed upon, should be emancipated, would not *267 also be valid and enforceable by Bismuth, unless indeed it can be made to appear that such a contract is illegal.
Accordingly, a strenuous effort has been made, in the argument of the case, to show that such a contract is contrary to the policy of our law, and therefore void. It is insisted that it tends to destroy the proper relation between master and slave; and that by putting the slave in a position in which the fruits of his labor, instead of belonging absolutely to his master, are applied towards his own emancipation, he is made to occupy that intermediate condition between freedom and slavery that the law does not tolerate: And it must be admitted that this argument is not without force.
If, however, any contract of this character can ever be, this one is, free from the objection that the slave is put in a condition between freedom and slavery. The petitioner does not appear to have been even privy to it. He was kept until his emancipation in a state of entire servitude, not being permitted to make any contract, or to act in any respect as a freeman, Hanna having shown extreme caution in avoiding any infringement of the laws prohibiting slaves from going at large or hiring themselves out.
The objection then does not apply in this instance more forcibly than it does in all cases of prospective emancipation: and to sustain it, we must go to the length of establishing a principle which will prohibit all such emancipations. This we cannot do; for whatever may be our opinion as to the policy of permitting them, we have no right to change the law; and their validity is now too well settled to be questioned.
I think, therefore, that this contract is not void as being against public policy; and that it is one which a court of equity would, on the application of Bis *268 mutk, have enforced against Hanna, if he had refused to execute it.
As Hanna has voluntarily complied with the obligation of his contract, the petitioner is placed in the same position that he would have occupied if he had been emancipated under a decree of a court of equity in a suit brought by Dismuth against Hanna. He is a freedman, and as such, is entitled to litigate with the creditors of Hanna their right to subject him to sale to satisfy their demands.
The question does not arise in this case as to the extent of the rights of the creditor if he had acquired a lien upon the petitioner by issuing or levying his execution before Hanna had been reimbursed the amount advanced by him ; and I express no opinion upon it.
Upon the facts as they exist, I think that the emancipation was effectual to exempt the petitioner from all liability for the debt, the execution for which has been levied upon him; and that he ought to have been discharged from custody. I am therefore of opinion to reverse the judgment.
Lee, J.
I am of opinion that the writ of habeas corpus is not the appropriate remedy for the assertion of the right to freedom claimed by the plaintiff in this case. It is true it was sustained by the opinion of two of the three judges who sat in the case of Buddle's ex'or v. Ben, 10 Leigh 467, but the reasons on which it was rested are to my mind quite unsatisfactory. That the claimant produces a deed of emancipation cannot, as it seems to me, change the remedy for the enforcement of the right which it is alleged to confer, and it is conceded that in general this right cannot be litigated upon a writ of habeas corpus; and although those who claim his custody, do not claim as masters that he is their slave, they do claim that to *269 them the deed of emancipation is ineffectual and that they have the right to treat him as property and subject to be sold as the slave of the debtor party. The question at last is one of freedom or slavery, absolute freedom or qualified slavery, and should be tried in a more convenient and appropriate proceeding than a habeas corpus. If the deed were assailed upon the ground that it was a forgery and was admitted to record by fraud, or was wholly invalid by reason of the insanity of the grantor or because he was otherwise incapable of making the same, I presume the writ of habeas corpus could not be regarded as a proper proceeding to try the right; and I cannot perceive that the case is different if the deed be contested upon the ground that it was made with intent to defraud creditors or because it was wholly ineffectual as to a creditor whose debt was created before it was executed. The detention grows out of the alleged status of the party as it respects the claimants under the execution ; they allege that as to them he is still a slave and liable to satisfy the debt; and although they do not claim absolute property in him as masters, yet the claim which they do make is such as should render them liable to the action provided by the statute. And moreover, no reason is perceived why the party might not resort to the court of equity for an injunction upon the ground that he was not liable to the execution. The owner of a slave levied upon by an execution to which he was not liable may enjoin the sale and obtain relief upon that ground, simply, without alleging any special reason for invoking the aid of a court of equity, and the case of a freedman would certainly not be less strong where the aid of that court is sought for his protection.
I concur therefore in what appears to have been the opinion of Judge Stanard in the case above cited, and -of the judge who decided this case, and think that the *270 writ was inappropriate to the petitioner’s case, and on that ground was properly dismissed.
XJpon the merits also, I find myself compelled to dissent from the opinion of the majority of the court.
By the Code of Virginia (ch. 103, § 11, p. 459) it is provided that all slaves emancipated shall be liable for any debt contracted by the person emancipating them before such emancipation was made; and it can scarcely be questioned that whether the emancipation be made by an indebted owner, directly, or indirectly, through the agency of another for the purpose of preventing the liability for debts, the effect must be the same. Such indirect emancipation with such purpose would be plainly in fraudem, legis, and would be as to antecedent creditors as utterly void and ineffectual as any other conveyance made with 1 'tent to hinder delay and defraud them. And such ii \my judgment is the true character of the emancipate m in this case. Hanna the owner of the petitioner at the time of making the conveyance to Marshall by whom the deed of emancipation was executed, was largely indebted both as principal and security and was doubtless insolvent; in the month of January previous he had executed a deed of trust upon all his property “ of every kind and description” for the security of his creditors and sureties; a large amount of property is designated in the deed, but the petitioner was not specially mentioned because as he states, he was advised by his counsel not to embrace him in the deed; the deed to Marshall was executed on the 26th day of March 1859 just three days before the note on which the judgment now sought to be enforced was rendered fell due; this deed recites falsely that it was in consideration of the sum of three hundred and fifty dollars paid by Marshall whilst Hanna himself admitted on the trial of the cause that the amount actually paid was a sum some where between twenty-one and twenty-five dol *271 lars only $ Marshall the grantee was a citizen of a free state on a visit to a son in law in Eockingham county and was about to return to the state in which he lived; and in May 1859, less than two months after the deed to him, and pending the suit on the note against Hanna, Marshall executes the deed of emancipation reciting falsely that it was in part consideration of the sum of three hundred and fifty dollars to him in hand paid. ' Considering all the circumstances of the transaction I cannot resist the conclusion that it was a plan concerted between Hanna and Marshall to enable the former to defeat the claims of creditors and to do that indirectly which Hanna believed he could not do by a direct emancipation executed by himself. It is true Hanna states that this was done in consequence of an agreement or understanding with Dismuth of whom he purchased the petitioner which however he thought only binding upon him in conscience and morality, that when he had realized the amount he had paid for him out of the wages and earnings of the petitioner, he was to emancipate him, and that when he sold him to Marshall, he had received in that way the amount of the purchase money excepting the sum agreed to he paid by Marshall, and that there was a similar understanding with Marshall that when he should have received that amount from the earnings of the petitioner, he was to set him free.
But I cannot think that such a private unrecorded agreement, even if it should be held to be valid as between the parties, would be binding upon the creditors of the vendee or would at all affect their right to subject the slave in his hands to the payment of their debts. He is at law the property of the vendee and as such subject to his debts to his full value, and no court I apprehend, would at the suit of either slave or original vendor entertain a bill to set up such secret-agreement against creditors and enquire how much of *272 the purchase money had been reimbursed to the vendee out of the earnings of the slave whilst in his possession.
I do not understand that it is claimed in the opinion of my brother Robertson that the emancipation in this case acquired any additional validity under the circumstances of the transaction from the fact that the deed was executed by Marshall and not by Hanna himself. On the contrary it seems to be fully conceded that the petitioner stands in no better position, in any respect, than he would occupy if Hanna on being reimbursed the amount paid by him to Dismuth, had himself executed the deed of emancipation. What then would have been the condition of the petitioner if the deed had been executed by Hanna ?
By our law as we have seen, an emancipated slave is liable for any debt contracted by the owner before the emancipation, and the debt in this case had been contracted before the deed was executed, and perhaps (though, this is left somewhat uncertain) before the agreement with Dismuth. But it is said that as the deed was executed before the creditor had acquired or could acquire any specific lien upon the property by the levy of an execution upon it, the emancipation is good and the liability created by the statute is controlled and in effect overrode by the private agreement between the owner and his vendor and the execution of the deed of emancipation under it, and that the petitioner is therefore entitled to his discharge. This is in effect to assert that the petitioner acquired an inchoate right to freedom under the contract between Dismuth and Hanna which was afterwards consummated by the deed of emancipation executed by Marshall, and that as this deed was before the actual levy of the fieri facias the creditor’s right was forestalled and defeated. I think neither of these propositions can be maintained. It has been solemnly declared as *273 the opinion of this court, that a slave has no social or civil rights, that he has no legal capacity to make or rescind a contract, and that he is without remedy for breach of an agreement, even for his emancipation. And it was accordingly held in two successive cases, after great consideration, that where in a will emancipation of a slave was made to depend upon his election to be free, as he had no legal capacity to make an election the clause declaring such emancipation was of necessity void and of no effect. Bailey, &c. v. Poindexter, &c. 14 Gratt. 132; Williamson, &c. v. Coalter's ex'ors, Ibid. 394. This want of legal capacity had been repeatedly and distinctly affirmed in previous cases; indeed it must be of necessity a distinctive feature and characteristic of the status of slavery. It therefore seems to be very clear that a slave can acquire no right whatever under such a contract between the former owner and his vendee; and what he cannot thus acquire directly, he cannot take indirectly through his former owner. In Dunlop v. Harrison, 14 Gratt. 251, it was held that as free negroes were prohibited by statute from holding slaves, so they could not be held by another in trust for their benefit. Bo as a slave can acquire no property directly neither can he acquire any interest in the same by way of trust. Haywood v. Craven's ex'or, 2 Caro. L. R. 557. See also, Trotter v. Blocher, 6 Port. R. 269, 305. It would be in direct contravention of this principle if a slave could acquire any interest under a contract between his master and his vendee touching his future emancipation which could strengthen such emancipation when made or give to it any additional force and effect to that which it would have without such previous contract. And if this be correct it cannot be right to hold that pre-existing creditors are shut off because they had not .levied their execution before the deed was exe *274 euted. The right to subject the property is expressly reserved by the statute and does not depend iipon the levy of the execution. There was no necessity for any such provision where an execution had been levied; the object of the act was to hold the slave bound for pre-existing debts where there was no lien by execution or otherwise. Unless therefore this supposed equity in favor of the vendor is to enure to the benefit of the slave, it is impossible to say that it can deprive the creditors of the right to subject the slave which they certainly would have had if there were nothing but the deed of emancipation in their way.
Let us now look a little more closely into the alleged agreement between Dismuth and Hanna. And here the first observation that occurs is upon the very unsatisfactory nature of the evidence by which it is attempted to be proved. Hanna himself is the only witness offered and he speaks of a bill of sale and of the agreement by which he was to emancipate the .petitioner when he should be repaid the three hundred and fifty dollars which he agreed to give for him out of his earnings; and he states that according to his impression, speaking of what had occurred only between two and three years before, he executed and delivered a writing containing the terms of the agreement. Neither the bill of sale, nor this writing nor any of the various letters which he said he had received from Dismuth on the subject is produced, nor any reason assigned for their non-production except that he did not know where the written contract which it was his impression he had executed, then was. He does not say he had lost the bill of sale or the letters he had received from Dismuth, nor does he undertake to state the terms and conditions, if any, of the former. The case was not submitted to a jury but was heard upon the law and the facts by the judge, and he no doubt *275 thought the evidence very unsatisfactory. But if it were less so, I incline to think that such a contract is liable to very grave objections and that its validity should not be maintained for any purpose whatever. I am aware that in some of our sister states similar contracts have been held valid, and in Tennessee, they have gone so far as to hold that such a contract should be enforced not only at the suit of one of the contracting parties but of any other person who may come forward as next friend of the slave; and that a contract between a master and his slave for the emancipation of the latter is good and may be enforced. Elias v. Smith, 6 Humph. R. 33; Lewis v. Simonton, 8 Humph. R. 185. But I am aware of no case in Virginia in which such a.contract has been enforced or held valid. A contract between a master and his slave for the future emancipation of the slave is utterly void and cannot be enforced against the master although the slave may have fully complied with his part of the agreement; Sawney v. Carter, 6 Rand. 179; Stephenson v. Singleton, 1 Leigh 72; nor has a contract between vendor and vendee of a slave for the future emancipation of the slave, as far as I am aware, ever been sanctioned except so far as it may be supposed to be countenanced by the case of Ruddle's ex'or v. Ben, above cited. Of that case it may be remarked that while Judge Tucker concurred with Judge Parker in thinking the writ of habeas corpus the appropriate remedy, yet upon the merits, he was for remanding the petitioner to the custody of the sheriff for proceedings under the execution; and that Judge Stanard while he concurred with Judge Parker upon the merits had strong doubt whether the writ should not have been dismissed and the prisoner remanded because the remedy was inappropriate. Certainly it is not a binding authority upon any point, and if it is to be understood as *276 affirming that such a contract can give any additional efficacy and effect to a deed of emancipation executed in conformity to it as against creditors that it would not have without it, I am constrained to dissent as much from the doctrine of law which it teaches as I do from the sentiment expressed by Judge Parker that the dictates of humanity and justice should prompt us to favor emancipation by maintaining the right of the master to bestow (and of course the capacity of the slave to receive) the privilege of acquiring property to serve as a foundation for a consideration which will support what the judge calls “ the inestimable grant of freedom.”
Such a contract for the future emancipation of a slave when the price paid shall be reimbursed out of his earnings, is I think, opposed to the general spirit of our decisions and the policy of our laws. The distinction which it implies between the slave himself and his earnings is no where recognized by them. They admit no separate interests between master and slave. The latter is to be wholly devoted to the interests of the former. Such arrangement is evasive of the provision of our statute which makes it a misdemeanor to permit a slave to go at large, trade for himself, or hire himself out for the benefit of any person whatever, if not also of that prohibiting a freed negro to l-emain in the state. The presence of the negro in this intermediate condition, this half way house, between freedom and slavery so plainly condemned by our law, is fraught with all or most of the evils which have rendered the departure from the state of the freed negro the imperative condition of his emancipation.
I think it is to be regretted that prospective emancipation was ever tolerated by the courts in Virginia, but its validity has been, perhaps, too often affirmed *277 to be drawn into question at this day. But where it has been sustained, it has been declared by will or deed duly recorded, as the law requires. The proposition here goes a bow shot beyond any previous case sustaining a prospective emancipation. It is in effect to declare such emancipation good, though not declared by will or deed admitted to record, but founded only upon a private agreement between the vendor and vendee of a slave under seal or otherwise and never admitted to record, and in which the slave has and can have no legal interest whatever; and this not only as between the parties but as against the creditors of the vendee whose debts were created before the deed of emancipation subsequently made was executed and recorded.
If such an agreement is to be held valid and enforced, its effect should be restricted to the parties themselves. It should not extend to the creditors of the vendee. To give it effect as to them is to defeat the plain intent of our statute. 'In none of the cases cited by the counsel that I have been able to see, was the controversy between the slave and a creditor of the vendee. They were all cases between the original parties to the agreement or between the slave or those claiming by purchase: nor does it appear from those cases that in the states in which they occurred there was a statutory provision like ours, in favor of creditors. At best such a contract, as it seems to me, can only confer a right upon the vendor to recover damages for its breach against the vendee, and a mere equity to call for its specific performance ; and this equity being in its nature a secret equity founded upon an agreement not recorded and the possession of the slave being with the vendee, it would as it seems to me, be against all the analogies of the law, to give it priority to the claims of creditors who became such before it *278 was effectuated by the execution of the deed of emancipation ; and such deed in my judgment ought to have no other or greater efficacy as against pre-existing creditors than if it had been executed without any such previous agreement.
I think the judge below did not err in remanding the petitioner to the custody of the sheriff, and am of opinion to affirm the judgment.
Decree reversed.